```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT BLUEFIELD
```

HAFCO FOUNDRY AND MACHINE
COMPANY, INCORPORATED,

      Plaintiff,

v.                                    CIVIL ACTION NO. 1:15-16143

GMS MINE REPAIR AND
MAINTENANCE, INC.,

      Defendant.

### MEMORANDUM OPINION AND ORDER

Pending before the court is plaintiff's motion for reconsideration of this court's order granting defendant's motion for a new trial as to damages. (ECF No. 100). That motion has been fully briefed and a hearing on the motion was held on June 13, 2018. For the reasons discussed below, the motion for reconsideration is **DENIED**.

### I. Background

Plaintiff Hafco Foundry and Machine Company, Inc. ("Hafco") filed the instant action for patent infringement on December 15, 2015. Hafco owns the patent for a Rock Dust Blower, U.S. Design Patent No. D681,684S. In 2014, Hafco entered into an agreement with Pioneer Conveyor, an affiliate of GMS Mine Repair and Maintenance, Inc. ("GMS"), by which Pioneer Conveyor was to distribute Hafco rock dust blowers to mining customers. The distribution agreement between Hafco and Pioneer Conveyor was terminated in or around early May 2015. According to Hafco,

following termination of the aforementioned distribution agreement, GMS began selling infringing rock dust blowers within the Southern District of West Virginia.

Trial of this matter began on May 15, 2017.  After a three-day trial, the jury returned a verdict finding that GMS had infringed Hafco's `684 patent and that the infringement was willful.  The jury awarded Hafco damages in the amount of $123,650.00.  On May 18, 2017, the court entered judgment in plaintiff's favor in the amount of $123,650.00.

By Memorandum Opinion and Order dated March 30, 2018, the court granted GMS's motion for a new trial on the issue of damages.  In so doing, the court found that the jury's award of $123,650 was against the weight of the evidence and that, on the evidence presented, $0 in compensatory damages was the outermost award that could be sustained.  The court therefore reduced the award to $0 and granted a new trial nisi remittitur at Hafco's option.

Hafco rejected the remittitur and filed the instant motion for reconsideration.

## II.  Analysis

It is important not to lose sight of the fact that Hafco, as the plaintiff, bore the burden of proving each and every element of its case by a preponderance of the evidence.

> In patent cases "[t]he burden of proving damages falls on the patentee," Lucent

> Techonologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009), and "[t]he [patentee] must show his damages by evidence," Philp v. Nock, 84 U.S. 460, 462, 17 Wall. 460, 21 L. Ed. 679 (1873). Damages "must not be left to conjecture by the jury. They must be proved, and not guessed at." Id.
>
> When a patentee seeks lost profits as the measure of damages, "the patent holder bears the burden of proving the amount of the award." Minco, Inc. v. Combustion Eng'g, Inc., 95 F.3d 1109, 1118 (Fed. Cir. 1996) (emphasis added). "[T]he amount of a prevailing party's damages is a finding of fact on which the plaintiff bears the burden of proof by a preponderance of the evidence." Smith-Kline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 (Fed. Cir. 1991). "[T]he amount is normally provable by the facts in evidence or as a factual inference from the evidence." Lindemann, 895 F.2d at 1406.

Promega Corp. v. Life Techs. Corp., 875 F.3d 651, 660 (Fed. Cir. 2017).

To recover lost profits, Hafco had to prove a causal relation between the GMS's infringement and its loss of profits. Oiness v. Walgreen Co., 88 F.3d 1025, 1029 (Fed. Cir. 1996). In other words, the burden rested on Hafco to show a reasonable probability that "but for" the infringing activity, it would have made GMS's sales. See id. It is Hafco's failure of proof on this point that led the court to grant a new trial on damages.

As the court noted in its Memorandum Opinion and Order of March 30, 2018,

> To show causation and entitlement to lost profits, a patentee must reconstruct the market to show "likely outcomes with infringement

3

factored out of the economic picture." Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999) ("Reconstructing the market, by definition a hypothetical enterprise, requires the patentee to project economic results that did not occur."). "To prevent the hypothetical from lapsing into pure speculation, th[e] court requires sound economic proof of the nature of the market." Id. Lost profits awards have been affirmed "based on a `wide variety of reconstruction theories in which the patentee has presented reliable economic evidence of `but for' causation.'" Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1377 (Fed. Cir. 2003) (quoting Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc., 246 F.3d 1336, 1355 (Fed. Cir. 2001)).

One "useful, but non-exclusive, way for a patentee to prove entitlement to lost profits damages" is the four-factor test articulated in Panduit Corp. v. Shahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978). Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1545 (Fed. Cir. 1995). "The Panduit test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made." Id. "A showing under Panduit permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's prima facie case with respect to `but for' causation." Id.

Whether a patentee relies on Panduit or some other means of showing entitlement to lost profit damages, it "must reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringement product." Ericsson, 352 F.3d at 1377 (emphasis added). In a two-supplier market, "lost profits for all sales made by an infringer are easier to obtain because there are only two suppliers in the market." Water Techs. Corp. v. Calco, LTD., 850 F.2d 660, 672 (Fed. Cir. 1988). However, "an accurate reconstruction of the

4

>hypothetical `but for' market takes into account any alternatives available to the infringer." Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341, 1351 (Fed. Cir. 1999).
>
>In the instant case, there was no attempt to reconstruct the market. "[Hafco] simply assumed that every sale made by [GMS] would have been theirs in the absence of the infringement." Keg Techs., Inc. v. Laimer, 436 F. Supp. 2d 1364, 1369 (N.D. Ga. 2006). The record is silent with respect to the second and third Panduit factors – absence of acceptable non-infringing substitutes and manufacturing and marketing capability to exploit the demand.
>
>Nor did Hafco show that it was a "two-supplier market where any sale made by one competitor can be presumed attributable to its opponent were it not for the infringement." Id. at 1369-70; see Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983) ("Where, as here, the patent owner and the infringer were the only suppliers of the product, causation may be inferred."). Indeed, Hafco aggressively fought to keep any mention of other can rock dust blowers out of the record. In so doing, it made the tactical decision not to pursue a two-supplier market theory.
>
>At best, Hafco's evidence was that its rock dust blower was the first, but not the only, can rock dust blower in the marketplace. Furthermore, there is also evidence in the record that there are "thousands" of other rock dust blowers in the marketplace, albeit not of the can variety. Therefore, there is no evidence to support the notion of an absence of non-infringing acceptable substitutes. For these reasons, Hafco failed to meet its burden to demonstrate an entitlement to lost profits.

ECF No. 99 at pp. 24-27.

The Federal Circuit recently discussed the difficulty of proving lost profits damages.

5

> Damages under Panduit are not easy to prove. See, e.g., Ian Ayres & Paul Klemperer, Limiting Patentees' Market Power Without Reducing Innovation Incentives: The Perverse Benefits of Uncertainty and Non-Injunctive Remedies, 97 Mich. L. Rev. 985, 1030 (1999) ("The difficulties that patentees frequently have in proving the four Panduit prerequisites often mean that instead of being awarded lost profits (what amounts to make-whole damages), patentees must settle for the smaller reasonable royalty measure."); Christopher Seaman, Reconsidering the Georgia-Pacific Standard for Reasonable Royalty Patent Damages, 2010 B.Y.U. L. Rev. 1661, 1675 (2010) ("[S]uccessful claims for lost profits are becoming less common as courts have insisted on strict standards of proof for entitlement to lost profits." (quotations omitted)); Mark Lemley, Distinguishing Lost Profits from Reasonable Royalties, 51 Wm. & Mary L. Rev. 655, 657 (2009) ("Proving lost profits has not been easy, however."); see also Grain Processing, 185 F.3d at 1349–53 (patentee could not obtain damages under Panduit because a product that was not even sold on the market was considered an acceptable non-infringing alternative); BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218–19 (Fed. Cir. 1993) (patentee could not obtain damages under Panduit because it sold its products in a different price segment in the market than the infringing products); SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1165–66 (Fed. Cir. 1991).

Mentor Graphics Corp. v. EVE-USA, Inc., 851 F.3d 1275, 1285 (Fed. Cir. 2017).

In its motion for reconsideration and at the hearing on that motion, counsel for Hafco insisted that Hafco had met its burden under Panduit and, in particular, had demonstrated the existence of a two-supplier market. With respect to the two-supplier market, Hafco argues that "[m]oreover, in finding that

6

the can duster market was not a two-supplier market, the Court had to go outside of the record to make that determination. An unquestionable abuse of discretion." ECF No. 100 at p.5. The court disagrees with Hafco on several fronts.

First, the testimony of William Fornaci does not establish the existence of a two-supplier market during the relevant time period, i.e., that is sometime after May 2015 through the trial date in May 2017. Fornaci testified that Hafco's duster was a "new product for a completely new industry" and that Hafco believed that its product was "unique". ECF No. 102-1 at pp. 10-12. He further testified that it was "a completely new product in an industry, you know, that we're also new to." Id. at p. 13. These statements of course are not qualified by any specific dates and, on their face, appear to relate to the time period when the Hafco rock duster was invented.

The only evidence in the record that arguably supports Hafco's assertion that the can duster market was a two-supplier market is Fornaci's testimony that "[u]ntil, you know, until GMS came out with, with their, their copy of our product, the, the only can duster out there was the Hafco rock duster." Id. at p. 37. Even if that were a true statement, it is not sufficient to meet Hafco's burden of demonstrating the existence of a two-supplier market during the entirety of the relevant time period.

7

For this reason, the court concluded that there was a failure of proof on Hafco's part as to damages and, therefore, "the verdict [wa]s against the clear weight of the evidence."

Second, to the extent that Hafco argues that there was a two-supplier can duster market during the relevant time period and relies upon Mr. Fornaci's testimony in so doing, that is a false characterization of his testimony. During cross examination, counsel for GMS followed up with Mr. Fornaci:

> Q: I want to follow up on the questions that you've already answered. You, you said that the Hafco and the GMS products were the only ones out there. That's not true at all, is it?
>
> A: Well, Hafco was the first one out there. We were the first can duster to be out there and that we're sure of.

Id. at p. 38. Counsel for GMS attempted to go further with this line of questioning and counsel for Hafco objected. A sidebar conference was held and the court overruled the objection. See id. at pp. 39-43. Upon subsequent questioning, Mr. Fornaci qualified:

> Court: You, you testified that the Hafco rock duster was the only one out there. What period of time does your statement to that effect relate?
>
> A: The Hafco rock duster was, was the first, the first version of anything that looked at all similar to this that utilized the 55-gallon drum to be referred to as a can duster, an air-powered rock dust blower in a 55-gallon drum.

8

Id. at pp. 43-44.  "First" does not mean the same thing as "only" and Mr. Fornaci's testimony fails to establish that from May 2015, when the distributorship agreement between Hafco and GMS was terminated, through May 2017 the GMS and Hafco products were the only can dusters on the market.

Third, if, as Hafco argues, Mr. Fornaci's testimony really was that the Hafco and GMS can dusters were the only can dusters in the marketplace then that evidence is false.  And, contrary to Hafco's contention, the court did not need to go outside the record to make that determination.  The deposition of Courtland Joshua Helbig was offered into evidence in connection with the Markman hearing.  Mr. Helbig testified during deposition as follows:

> Q: Were there other competitors in the market?  And I am talking about the 2014-2015 time frame, were there other competitors in the market selling can dusters that you had to beat out for sales?
>
> A: Yes, I mean, there was tons of competitors in the market for just general dusters.  Can dusters, there is at least one competitor that was making units similar to the one that we make.
>
> Q: Were your sales - - I'm sorry, who is that other competitor?
>
> A: You know, I'm not - - I'm not 100 percent certain who they are today.  I believe it was Davis Electric that was manufacturing it and then it was  - - some of them were sold direct from Davis and some of them were distributed.  I just saw literature

9

> on them distributing, which I think is in our information, from Irwin Supply Company.

\* \* \*

Q: Were your sales people coming to you - - were they complaining about there being another competitor in the market?

A: Yes.

Q: Well, what were those conversations like? Were they being undersold or - -

A: Well, basically, people were saying, you know, it was a better unit for cheaper, the information that was brought back. I took that information then, to Hafco, as well, so - -

\* \* \*

Q: Did your sales folk tell you what was better about the Davis product?

A: Just that the customers liked it better, at times and that is not 100 percent, either. It wasn't all situations. Some situations, it was just cheaper.

\* \* \*

Q: When did you first see a copy of this patent?

A: When we had an issue with Davis Electric, I believe, them underselling the unit that we spoke of before. And, you know, they claimed they could stop Davis from selling the unit.

Q: Hafco could stop Davis from selling?

A: Uh-huh, but I take that back. . . . But the first time I would have really probably looked it up or found anything

10

>           about it is when we had Davis Electric
>           enter the marketplace.
>
> Q:       What was it about Davis entering the
>           marketplace that got you looking into this
>           patent?
>
> A:       They were undercutting our price and
>           taking sales from us.  So we contacted
>           Hafco, "Hey, we thought this was patented,
>           we had protection.  What can you do about
>           this?"  They asked us to purchase a unit.
>           We did that and shipped it to them.
>
>           And I contacted and
>           talked to Bill several times and
>           they said they sent them a letter,
>           but Davis didn't care and they just
>           kept making it.  I believe it was
>           Davis Electric that was building it
>           or it didn't apply or something.

Deposition of Courtland Joshua Helbig, September 12, 2016, ECF No. 55-2 at pp. 45-47, 85-86.  Mr. Helbig's testimony regarding the Davis can duster, which is evidence of record in this case albeit not part of the trial record, is corroborated by the fact that Hafco has sued Davis Electric Company, Inc. for patent infringement in the United States District Court for the Northern District of West Virginia.  See Complaint filed in Civil Action No. 1:17-cv-188 in the United States District Court for the Northern District of West Virginia (ECF No. 1).  In the Davis ligitation, Hafco alleges that:

> 16.    Davis, without authorization by Hafco,
>        made, advertised, offered for sale and
>        sold infringing rock dust blowers (the
>        "Davis Blowers") within the Northern
>        District of West Virginia and elsewhere.

11

>       17.     As early as March 28, 2012, Hafco began
>               making written demands that Defendant
>               Davis cease selling its infringing
>               products.  Despite those demands,
>               Defendant Davis continued to distribute,
>               offer to sell and sell infringing Davis
>               Blowers to customers in the Northern
>               District of West Virginia and elsewhere
>               until at least June 5, 2017.

Id. at ¶¶ 16-17.  Mr. Helbig's deposition testimony, considered in tandem with the Davis litigation, makes it clear that, during the relevant time period, there were at least three can duster competitors in the marketplace: Hafco, GMS, and Davis. Therefore, Hafco's assertions in this court that there was a two-supplier market are patently false.

This court also has an obligation to order a new trial where a jury verdict "is based upon evidence which is false" or the verdict "will result in a miscarriage of justice." McFeeley v. Jackson Street Entertainment, LLC, 825 F.3d 235, 247 (4th Cir. 2016).  Hafco was successful in keeping out evidence of the Davis can duster at trial because, given the manner in which GMS defended this case, the existence of other can dusters was not relevant to the issue of whether the GMS can duster infringed Hafco's design patent.  However, Hafco cannot rely on the fact that this evidence was excluded at trial for one purpose and now argue that such evidence does not exist for purposes of damages. In other words, Hafco needed to squarely address the existence of the Davis can duster in some manner to prove its entitlement to

lost profit damages in this case. For example, Hafco could have chosen to show that the Davis can duster was infringing or that it was an unacceptable substitute for one reason or another. What Hafco could not do was simply ignore it. That is exactly what Hafco chose to do in this case.

To be sure, GMS could have done a better job in seeking to introduce evidence of the Davis can duster at trial. For example, it could have argued that the evidence was relevant to the issue of damages which would have brought the issue to the court's attention sooner. However, it was Hafco's burden to prove damages in its case-in-chief and, therefore, in the context of this case, Hafco had to reconstruct the market. This it did not do.

Finally, Hafco's argument that the court had sufficient evidence before it to award a reasonable royalty is without merit.

> [A] patentee must put on evidence supporting its assertion of a reasonable royalty rate. See Lindemann, 895 F.2d at 1406 ("The patentee must then prove the amount of damage."). The reasonabl[e] royalty analysis involves an approximation of the market as it would have hypothetically developed, and this, "in turn, requires sound economic and factual predicates." Riles, 298 F.3d at 1311 (emphasis added). The Federal Circuit has explained that where a patentee fails to put on sufficient evidence of a reasonable royalty rate, the patentee will face an uphill battle overcoming the presumption that the amount awarded was reasonable: "the district court's obligation to award some amount of damages does not mean that a patentee who puts on

13

>little or no satisfactory evidence of a
>reasonable royalty can successfully appeal on the
>ground that the amount awarded by the court is
>not `reasonable' and therefore contravenes
>section 284." Dow Chem., 341 F.3d at 1382
>(internal quotation marks omitted).  Where little
>or no satisfactory evidence of a reasonable
>royalty is presented, the court should "award
>such reasonable royalties as the record evidence
>will support." Id.  Where the record lacks any
>evidence of a reasonable royalty rate, the
>Federal Circuit has approved of awarding "zero
>damages" because "`[t]he statute [35 U.S.C. §
>284] requires the award of a reasonable royalty,
>but to argue that this requirement exists even in
>the absence of any evidence from which a court
>may derive a reasonable royalty goes beyond the
>possible meaning of the statute.'" Lindemann,
>895 F.2d at 1407 (quoting Devex Corp. v. General
>Motors Corp., 667 F.2d 347, 363 (3d Cir. 1981))
>(alteration in original).

Boston Scientific Corp. v. Johnson & Johnson, 550 F. Supp. 2d 1102, 1120 (N.D. Cal. 2008).  The royalty rates that Hafco suggests are supported by the record are, quite simply, unreasonable.  Hafco argued that the amounts paid by GMS to sell its can duster were evidence of a reasonable royalty.  This argument completely ignores the clear distinction between a commission paid to an agent who sells a product and a royalty paid by a competitor for a license to sell a product that would otherwise violate the licensor's patent.

Based upon the foregoing, Hafco's motion for reconsideration is **DENIED**.

The Clerk is directed to send copies of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 26th day of June, 2018.

                ENTER:

                */s/ David A. Faber*
                David A. Faber
                Senior United States District Judge